[Civ. No. 2642.   Fourth Dist.—April 24, 1941.]

AVRIL WALKER, Appellant, v. HUBERT F. LAUGHARN, as Trustee in Bankruptcy, etc., Respondent.

Gerard Remington for Appellant.

Edward K. Zuckerman, Arthur Edmund Stein and Joseph I. Siegel for Respondent.

GRIFFIN, J.—This is an action to quiet title to certain real and personal property commenced by plaintiff and appellant Avril Walker against defendant and respondent Laugharn, as trustee in bankruptcy of Dr. R. H. Gerber, a bankrupt. Respondent answered and also filed a cross-complaint alleging that the purchase and assignment to appellant of the property involved was made to hinder, delay and defraud the creditors of the bankrupt, and was fraudulent and void, and prayed that the property be declared to be an asset of the bankrupt estate. The court rendered judgment in favor of defendant and cross-complainant, and plaintiff and cross-defendant has appealed.

The property in dispute was: (1) Assignment to appellant of various accounts of the face value of approximately $10,000 due to Dr. Gerber. This assignment was claimed to have been made in August, 1936, as security for past-due wages and rents due appellant. (2) One Texas & Pacific Certificate claimed to have been purchased by appellant on June 22, 1936, for the price of $1,017. (3) Mexican bonds claimed to have been delivered to her in January, 1935, as the result of an agreement made with Dr. Gerber in 1931 to repay a loan of $400 made by her to him. (4) Real property

consisting of a six-room house on Irolo Street known, and hereinafter referred to, as Irolo Street house.

The court found that on May 18, 1937, Dr. Gerber was adjudicated a bankrupt upon a voluntary petition; that the assets of his estate were only nominal or of no value at all, and that the liabilities were approximately $48,000; that for a long time prior to 1931, he was and now is indebted to various and sundry creditors in said sum; that Gerber was the actual owner and possessor of the properties above mentioned at the time that certain of the indebtedness above mentioned was incurred; that in contemplation of legal action being taken on said indebtedness and for the purpose of placing said real and personal property beyond the reach of attachment or execution or other legal process by his creditors, and in order to hinder, delay, and defraud his said creditors and to prevent the application of said assets and properties to the satisfaction of the claims of said creditors, the said Gerber and the appellant and each of them conspired together and with each other to wilfully defraud the creditors of said Gerber by concealing and transferring the assets and said properties, real and personal, of said Gerber; that pursuant to said conspiracies and in furtherance thereof, various and sundry sums of money, comprising all of the earnings of said Gerber, were so transferred and placed in the hands of the appellant over a period of several years and while said Gerber was indebted to certain creditors who are now creditors of his bankrupt estate, with the intention to defraud the creditors of Gerber; that there was no actual change in possession of said property and said properties remained in the actual possession and control of said Gerber; and that said purported transfers are invalid and fraudulent.

Appellant contends that there was no sufficient evidence to justify the court's judgment that the above-mentioned transactions were made to delay or defraud creditors of the bankrupt. Exception is also taken to the court's ruling on the admissibility of certain evidence. The following is a summary of certain facts and admissions as testified to by Gerber and appellant Walker. Prior to 1931 appellant, an unmarried woman, was employed at a salary of $19 per week. In November, 1931, she went to work for the bankrupt, Dr. Gerber, as housekeeper and office assistant, and

gave up her former position. She worked for Gerber for 14 months at a salary of $10 per month plus carfare and expenses. However, none of this money was actually paid to her during this 14 months period. At about this same time she claims to have loaned Gerber $400 in cash, which she claims to have saved from her work, but which money she did not keep in any bank or safety deposit box but kept it home where she boarded. In return for this $400 loan it is claimed that Gerber promised to give her certain Mexican bonds when he obtained them. However, he didn't obtain them until several years later in 1935, when the bonds were claimed to have been given her. The bonds are part of the property in question.

The Irolo Street property was acquired at about this same time in 1931 by the following transaction: The corporation in which Gerber, his son, and a Mr. Sunberg were interested and apparently owned, was the owner of lot one in Westwood Village. This lot was exchanged for Westwood lot two, which exchange was made on an even basis. As part of this same transaction, lot two was transferred to appellant, who borrowed $700 on it and gave the $700 to Gerber. Supposedly, Gerber then paid the $700 to Sunberg, or the corporation, as full payment for lot one. Hence, appellant then had the equity in lot two for nothing and had paid for lot one from the money borrowed on lot two. Lot two was shortly thereafter used to buy the Irolo Street property and was used as a down payment thereon of $1,000. Title to the Irolo Street property was taken in the name of appellant Avril Walker. The $700 mortgage on lot two was assumed and later paid off, supposedly by appellant, but out of the bank account discussed later herein.

Appellant claims at this point to have established the following considerations from these transactions: that since lot two was traded for $1,000 and only $700 was owed on it, a $300 profit was made. Of this, Gerber made $175, which he allowed appellant to keep, since he supposedly owed her this amount, i. e., 14 months wages at $10 per month, plus $35 expenses for carfare, etc. Appellant also was allowed to keep the other $125. Hence, the $300 equity supposedly belonged to appellant and not to Gerber, and formed the principal basis of her claim that she, and not Gerber, purchased the Irolo Street property. That property was ad-

mittedly purchased at the suggestion of Gerber. The purchase was entirely engineered by him and he attended to the business end of it. He stated that he wanted the property as a home for himself and his daughter and for an office. The only amount that actually went into the purchase of the Irolo Street property was the value of Westwood lot two, and escrow charges in a small amount. The doctor's testimony on this point obviously showed that he considered and still considers the house as belonging to him.

After the purchase of the home and since 1931, the method of the maintenance of bank accounts and the conducting of the business of Gerber is very illuminating. Gerber, at the time of trial, claimed to be still conducting a medical office. He was a "naturopathic" physician. In 1931, immediately after the Irolo Street house was purchased, Gerber had his own bank account and paid bills on this house from this account. Shortly thereafter, appellant opened a bank account under the name of Ametropathic Institute at the suggestion of Gerber. This account continued until 1933, when appellant, at Gerber's suggestion, changed the account to the name of A. Walker. All funds Gerber received from his practice or otherwise were deposited in this account. All of his bills were paid from this account and whenever he wanted money she gave him a check on the account. Practically all checks written on this account were written for Gerber. Appellant claimed she borrowed money from various sources in small sums from time to time and these sums were repaid from the bank account. Payments on the mortgage on the Irolo Street property and taxes thereon were made directly from this account. Many of the checks were made out by Gerber and merely signed by appellant "A. Walker". Appellant no doubt knew of Gerber's indebtedness during at least a portion of the time she carried the bank account. She admittedly loaned Gerber all of the money he wanted from the account and allowed all moneys due her from him to accumulate. She never received any payments at all in cash for her wages or salary, but the same were merely deemed to have been paid because of the fact that she could draw on the bank account. Supposedly, records were kept as to what Gerber owed her but the evidence indicates that these records were destroyed except the last account, which account was prepared just prior to bank-

ruptcy, and which formed the basis for setting forth the amount of his indebtedness to her.

The Texas & Pacific Certificate in question was purchased from this same bank account by a check in the handwriting of Gerber and purchased through an account· he carried through Hutton & Company, brokers. This bond was bought at his suggestion. He admitted that he had previously dealt in these same bonds for himself and had made a profit. She knew nothing of the bond or its value when purchasing the same and merely followed his suggestion. The certificate of this stock was kept in a safety deposit box by appellant but it was admitted that the daughter of Gerber had access to the box. The Mexican bonds which Gerber supposedly gave appellant were kept in this same box. The assignment of the accounts receivable which were supposed to be held as security for money due appellant from the bankrupt, completes the transfers involved in this action, and is significant mostly in that it constituted a complete concealment and transfer by Gerber of all of his assets to appellant so as to conceal the same from his creditors. Just how appellant could accumulate these holdings on $10 per month plus $35 expenses and carfare and still repay the sums claimed to have been borrowed and yet be a creditor of the bankrupt in the sum of $2,500, is not only astonishing to say the least, but is a great source of solace and a real inspiration to those desiring to accumulate a modest *quantum* of worldly goods without regard to creditors.

The inconsistencies in the testimony of appellant and the bankrupt as well as the inherent improbability of their testimony and the glaring intentions of fraud seem too apparent to require argument. From the very nature of the action, direct proof of the fraudulent intent of the parties is an impossibility. For this reason and because the real intent of the parties and the facts of the transactions are peculiarly within the knowledge of those sought to be charged with the fraud, proof indicative of fraud must come by inference from the circumstances surrounding the transaction, the relationship and interests of the parties. The inference of fraud drawn by the trial court from the irregularities of the instant transactions is reasonable. (*Adams* v. *Bell,* 5 Cal. (2d) 697 [56 Pac. (2d) 208]; *Cioli* v. *Kenourgios,*

59 Cal. App. 690, 697 [211 Pac. 838]; *Fross* v. *Wotton*, 3 Cal. (2d) 384 [44 Pac. (2d) 350].)

We have carefully examined the claimed errors of the trial court in striking portions of certain answers given by appellant; in sustaining objections to certain other questions; and in sustaining an objection to certain testimony in reference to the actual value of the assigned accounts. The offer of proof in that regard was in this form: "Mr. Remington: Well, for the sake of the record, Your Honor, at this time I desire to make an offer to counsel and the trustee in bankruptcy that Miss Walker will accept $500 for the accounts." It becomes immediately apparent that the offer of proof was deficient, not only as to form but as to substance, and the record in respect to the claimed errors justifies the conclusion that appellant's claim in this respect is unfounded and without merit.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.