MICHAEL D. MARSHALL, Plaintiff–Appellant, v. UNIVER-
SITY OF HAWAI'I, PAUL KOPECKY, EDWARD J.
KORMONDY, CHARLES M. FULLERTON and DOE
ENTITIES 1–50, Defendants–Appellees

NO. 14728

(CIV. NO. 90–146)

DECEMBER 9, 1991

BURNS, C.J., HEEN, J., AND CIRCUIT JUDGE
HUDDY, ASSIGNED BY REASON OF VACANCY

22

24

OPINION OF THE COURT BY HEEN, J.

This is an appeal by Plaintiff–Appellant Michael D. Marshall (Marshall) from a summary judgment entered in favor of Defendants–Appellees University of Hawai'i (UH), Paul Kopecky (Kopecky), Edward J. Kormondy (Kormondy), and Charles M. Fullerton (Fullerton).[1] The dispositive question is whether Marshall should have been accorded time for discovery prior to any ruling on Defendants' motion to dismiss or for summary judgment (Motion). We answer yes as to a part of Count I and as to Counts III, IV and V, and vacate the judgment as to those counts; however, we answer no and affirm the judgment as to Counts II, VI, and VII.

I.

On October 28, 1988, Marshall, then an assistant professor in the College of Arts and Sciences at the UH Hilo campus (UH Hilo), filed an application for tenure and promotion (tenure application). At that time, Kormondy was Chancellor, Kopecky was Dean of Student Services, and Fullerton was Dean of the College of Arts and Sciences at UH Hilo. Marshall's tenure application was in accordance with a memorandum from Fullerton to the faculty establishing deadlines for processing tenure applications. According to Fullerton's memorandum, the deadline for an application to be routed through the tenure review process to Kormondy was

---

[1] Where appropriate hereinafter, Defendants–Appellees will be referred to collectively as Defendants. Also, where appropriate, Kopecky, Kormondy, and Fullerton will be referred to as the individual defendants.

March 10, 1989. The terms of Marshall's employment were governed by a collective bargaining agreement entitled "1987-89 Agreement Between the University of Hawai'i Professional Assembly and the Board of Regents of the University of Hawai'i" (Agreement).

On March 1, 1989, Kopecky, in accordance with his duties under the UH Hilo "Policy Statement on Sexual Harassment" (Policy) [2] promulgated by the Chancellor of UH Hilo, [3] interviewed a female UH Hilo student who complained of sexual harassment by Marshall in October 1984. Kopecky determined that "good cause"

---

[2] The Policy Statement on Sexual Harassment (Policy) reads in pertinent part as follows:

PROCEDURE FOR SEXUAL HARASSMENT COMPLAINTS

Any employee who considers herself or himself a victim of sexual harassment should contact the EEO/AA Coordinator. Any student who considers herself or himself a victim of sexual harassment should contact the Dean of Student Services. No complaint will be heard unless received by the EEO/AA Coordinator or by the Dean of Student Services within six (6) calendar months after the date on which the sexual harassment is alleged to have occurred, unless good cause for a later filing is demonstrated. The Coordinator or the Dean will request a written report from the complainant setting forth the allegations of sexual harassment. The Coordinator or the Dean, after consultation with the complainant, will investigate the matter, maintaining confidentiality to the extent possible. An effort will be made to settle the allegations informally with the people involved within a period of thirty (30) calendar days.

If a satisfactory resolution to the complaint cannot be reached through the above procedure, the EEO/AA Coordinator or the Dean will make available to the Chancellor or the appropriate Dean, Provost, or Director the information that has been compiled. If sufficient cause exists to warrant disciplinary action against an employee, the administrator is empowered to invoke the disciplinary article of the individual's unit contract within a period of thirty (30) calendar days from the time the administrator has been notified by the EEO/AA Coordinator or by the Dean of Student Services.

[3] We do not know from the record whether the Policy was promulgated by Kormondy or a predecessor.

existed to investigate the complaint. Kormondy also interviewed the student and agreed with Kopecky's assessment.

Kopecky initiated an informal investigation and interviewed Marshall on March 30, 1989. Marshall admitted engaging in romantic activity with the student in her home, but denied that his actions were unwanted or unwelcome. Kopecky told Marshall that he was investigating two complaints against Marshall. Marshall requested the names of the complainants and copies of their written statements. Kopecky would not reveal the names and told Marshall there were no written complaints because the investigations were still in the informal stage.

Kopecky was not able to resolve the complaints because of the conflicting accounts and because he did not have access to any medical or police records. However, after his meeting with Marshall, he felt there was factual support for the first student's complaint and recommended a formal investigation. On the basis of advice from the State Attorney General, Kopecky recommended to Kormondy that a private investigator be engaged to conduct a formal investigation and a committee be appointed to review the results of the investigation. Upon Kormondy's instruction, Fullerton retained an investigator and organized a committee.

On May 12, 1989, Fullerton provided Marshall with a statement of the complaint, but not a statement from the complainant. [4] On the same day, Kormondy informed Marshall by letter that if the "formal" hearing was not completed by May 24, 1989, the

---

[4] Fullerton's statement reads:

A complaint of sexual harassment has been made by a student against you. The alleged incident occurred in the student's home where you were an invited guest. The student alleges that you made unwanted and unwelcome physical advances to her. This sexual harassment resulted in serious medical problems for the student. An attempt was made to resolve the issue at an informal level. That not being possible, formal procedures are being initiated.

date on which promotion and tenure recommendations were required to be transmitted to the UH Board of Regents (Board), Marshall's probationary period would be extended for one year.

On May 22, 1989, Marshall filed a grievance in accordance with the Agreement alleging that Kormondy did not properly evaluate Marshall's tenure application and that the extension of his probationary status "was taken as a form of discipline without just cause. I have been discriminated against based on my race." In the grievance document, Marshall demanded that his tenure application be forwarded to the Board for action without any comment from Kormondy that might prejudice approval.

On August 16, 1989, the hearing committee reported to Fullerton that it could not reach a conclusion on the complaint against Marshall and recommended that the matter be closed. On August 23, 1989, Fullerton advised Kormondy of the report and his concurrence with the committee's recommendation. Fullerton also recommended that Marshall's tenure application be reactivated and Marshall be recommended for tenure retroactive to July 1, 1989. Fullerton's recommendation was followed, and the Board approved tenure for Marshall effective July 1, 1989. On December 5, 1989, after Marshall was informed of the Board's actions, his grievance was withdrawn. However, the UH Hilo personnel office did not receive notice of the Board's action on the change in Marshall's rank and salary until Marshall complained, on January 19, 1990, that the paperwork had not been forwarded to that office. Additionally, the approval of Marshall's tenure and promotion was not publicized, contrary to UH Hilo policy.

Marshall filed the complaint below on April 17, 1990. Kopecky, Kormondy and Fullerton are named as defendants in their individual capacities.

The thrust of the complaint's seven counts is as follows:

Count I: against UH for violating the Agreement and the Policy.

**Count II:** against UH for emotional distress caused by UH's willful, wanton and reckless breach of the Agreement.

**Count III:** against Defendants for negligent infliction of emotional distress on Marshall.

**Count IV:** against Defendants for intentional infliction of emotional distress.

**Count V:** against Defendants for invasion of privacy.

**Count VI:** against Kopecky, Kormondy, and Fullerton for interference with prospective contractual relations.

**Count VII:** against Kopecky, Kormondy, and Fullerton in their individual/personal capacities, under 42 USC § 1983, for violating Marshall's civil rights.

On May 30, 1989, Defendants filed their Motion. The Motion was heard on June 25, 1990, and summary judgment in favor of Defendants on all counts was entered on July 24, 1990.

## II.

Marshall argues that, since he was not accorded adequate time to conduct discovery, the lower court erred in granting summary judgment. Defendants counter by pointing out that Marshall did not file an affidavit showing the need for discovery as required by Rule 56(f), Hawai'i Rules of Civil Procedure (HRCP) (1990).[5] Marshall's non–compliance with Rule 56(f), HRCP, is not fatal to him.

---

[5] Rule 56(f), Hawai'i Rules of Civil Procedure (1990), provides:

 **(f) When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present

In *Crutchfield v. Hart*, 2 Haw. App. 250, 630 P.2d 124 (1981), this court stated that Rule 56(f), HRCP, should be liberally construed and reversed an award of summary judgment on the basis that the non–moving party had not had adequate opportunity to conduct discovery. In *Crutchfield*, the non–movant's memorandum opposing the motion for summary judgment, filed just three days before the hearing, informed the presiding judge of the lack of adequate time for discovery. We stated that even though the rule had not been followed, the issue of lack of adequate time for discovery had been seasonably raised. We suggested to the trial court that it fix a reasonable time frame for conducting discovery.

In this case, the last service of the complaint and summons was effected on UH on April 24, 1990. The Motion was filed on May 30, 1990, a mere 36 days after the last service and 43 days after the complaint was filed. In his June 22, 1990 memorandum opposing the Motion and at the hearing on the Motion, Plaintiff informed the lower court that he needed discovery on several key issues. Defendants argued that Plaintiff had three weeks between May 30, 1990, and the June 25, 1990 hearing in which to conduct discovery, and that he had not complied with Rule 56(f), HRCP.

For the reasons outlined below, we hold that Marshall should have been given time to conduct discovery on a part of Count I and on Counts III, IV and V.

### III.

In Counts I and II, which are against UH alone, Marshall seeks consequential damages resulting from UH's alleged breach of the Policy and the Agreement (Count I), and damages for emotional

---

by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

distress allegedly caused by UH's willful, wanton, and reckless breach of the Agreement (Count II).

## A.

UH argues that under Hawai'i Revised Statutes (HRS) § 661–3 (1985)[6] the lower court had no jurisdiction to entertain Counts I and II. We disagree. The plain language of the statute merely precludes an action against the state where the plaintiff already has an action pending against any person who at the time the claim allegedly arose acted or professed to act, directly or indirectly, under the state's authority.[7] The statute does not operate to prevent a joinder of the state and any such person as defendants in one suit, as is the case here.

## B.

UH argues that Marshall's action on the Agreement in Counts I and II is barred on the ground that he has failed to exhaust his administrative remedies. We agree. *See Winslow v. State*, 2 Haw. App. 50, 625 P.2d 1046 (1981).[8] However, whether the principle of exhaustion applies to the Policy depends on the intent of the

---

[6] Hawai'i Revised Statutes (HRS) § 661–3 (1985) provides:

**No jurisdiction, when.** No person shall file or prosecute under this chapter any claim for or in respect to which he or any assignee of his has pending an action against a person who, at the time when the claim alleged in the action arose, was, in respect thereto, acting or professing to act, directly or indirectly, under the authority of the State.

[7] In construing a statute the court will determine the legislative intent from the statute's plain language. *National Union Fire Ins. Co. v. Ferreira*, 71 Haw. 341, 790 P.2d 910 (1990).

[8] Marshall's reliance on *Baldeviso v. Thompson*, 54 Haw. 125, 504 P.2d 1217 (1972), and *Lane v. Yamamoto*, 2 Haw. App. 176, 628 P.2d 634 (1981), to support his argument that the principle of exhaustion is inapplicable here is misplaced.

parties to the Agreement regarding the legal nature and effect of the Policy. We turn now to that question.

## C.

Both parties maintain that the Policy is not a part of the Agreement. However, Marshall argues that the Policy is a contract under case law[9] and Article III. A. 1. of the Agreement.[10] UH argues that the Policy is not a contract in "language, form or content," and that it cannot be converted into one by Article III. A. 1. UH contends Article III. A. 1. merely ensures the retention of certain rights and benefits but does not establish that the Policy is to be construed as a contract. In our view, the legal nature and effect of the Policy is a

---

*Baldeviso* was not a case involving the withdrawal of a grievance procedure. In *Lane*, no administrative processes were available to provide the plaintiff with a remedy.

[9] Marshall cites *Martinez v. Parado*, 35 Haw. 149 (1939), and *Bright v. American Soc. of Composers Authors & Publishers*, 2 Haw. App. 471, 634 P.2d 427 (1981), in support of his argument. UH argues that *Martinez* and *Bright* are inapposite. We agree with UH. Those cases deal with the nature of constitutions, rules and bylaws of unincorporated associations. UH is a body corporate. HRS § 304–2 (1985).

[10] Article III. A. 1. of the 1987–89 Agreement Between the University of Hawai‘i Professional Assembly and the Board of Regents of the University of Hawai‘i (Agreement) provides:

**CONDITIONS OF SERVICE**

A. MAINTENANCE OF RIGHTS AND BENEFITS

1. Except as modified by the terms of this Agreement, Faculty Members shall retain all rights and benefits provided in the written rules, regulations, and policies formally adopted by the Board of Regents existing at the execution of this Agreement which pertain to wages, hours, and other terms and conditions of employment.

 The minutes of the Board of Regents shall constitute the basis of the applicable rule, regulation, or policy.

32

question of fact, since it depends on the intent of the parties to the Agreement. *See Bishop Trust Co. v. Central Union Church*, 3 Haw. App. 624, 656 P.2d 1353 (1983).

It appears from a fair reading of Article III. A. 1. that the parties to the Agreement intended that any rights and benefits relating to wages, hours, and terms and conditions of employment accorded to the faculty in the policies adopted by the Board have a degree of permanency during the term of the Agreement.[11] Although the policies may be changed during the term of the Agreement, the rights or benefits bestowed by them on the faculty members are "frozen," as it were, as of the execution of the Agreement.

The record shows the Policy was adopted in accordance with the directive of UH Executive Policy E1.203 to implement the Board's policy banning sexual harassment.[12] The Policy, with its procedure for handling complaints, is the essential instrument for

---

[11] Where the terms of an agreement are clear and unambiguous, its construction and the legal effect to be given to it is for the court. *Bishop Trust Co. v. Central Union Church*, 3 Haw. App. 624, 656 P.2d 1353 (1983).

[12] The Policy states, in pertinent part:

By the terms of University of Hawai'i Executive Policy E1.203, *University Statement on Sexual Harassment*, Chancellors are charged with the responsibility and authority to implement the Board of Regents Policy on Nondiscrimination and Affirmative Action (Section 1–5 of the *Board of Regents Bylaws and Policies*.) That policy now includes, by virtue of applicable Federal laws, a prohibition against sexual harassment. All members of the University Community — students, staff, and faculty — are covered. The University of Hawai'i at Hilo Policy on Sexual Harassment is as follows:

I. The University of Hawai'i at Hilo is a learning and working community based on mutual respect. It does not approve and will not condone activities constituting sexual harassment in the conduct of the day–to–day affairs of the University.

II. Unwelcome sexual advances, requests for sexual favors, and other physical and expressive behavior of a sexual nature constitute sexual harassment when:

furtherance of the Board's policy on the UH Hilo campus.[13] Without such an instrumentality, the Board's policy is little more than a noble statement of purpose.[14]

However, the Agreement leaves open how the faculty members may ensure that their rights under such Board policies in fact are maintained during the term of the Agreement or, if those rights are violated, what steps the faculty may take to enforce them. Those questions can only be resolved by determining the intent of the parties to the Agreement. Did they intend to ensure the maintenance of those rights through the Agreement, in which case the grievance procedure would apply, or did they intend that any such policy would have a life of its own, as it were, for enforcement purposes? If they intended the latter, what remedies did they intend would be available to the faculty for an alleged breach of such a policy? Those are clearly genuine issues of fact that are material to Marshall's action on the Policy.[15]

---

Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or educational benefits or services;

Submission to or rejection of such conduct by an individual is used as the basis for academic or employment decisions affecting the individual; or

Such conduct has the purpose or effect of unreasonably interfering with an individual's academic or professional performance or creating an intimidating, hostile, or offensive employment or educational environment.

[13] Implement is defined as "to carry out: ACCOMPLISH, FULFILL. . . ; esp: to give practical effect to and ensure of actual fulfillment by concrete measures[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1134 (1981).

[14] It appears also that whether the Board's policy was formally adopted is an issue of fact to be resolved.

[15] We note that under the Policy the disciplinary article of the Agreement may be invoked if grounds are found for such action. Thus, at least UH considered there was some relationship between the two documents. *See supra* note 2.

We reject UH's argument that the Policy did not "pertain to wages, hours, and other terms and conditions of employment." The clear import of the Policy is that every employee is prohibited from engaging in sexual harassment. We take judicial notice of the fact that issues relating to sexual harassment and UH policy on that topic have been the subject of long and heated debate among the UH administration, faculty, and students, and even in the community in general. We do not believe it can be denied that a policy prohibiting sexual harassment such as we have here establishes conditions of employment for a UH faculty member.[16] Neither can it be denied that the expectation of all concerned is that its procedural components will be applied equally and fairly to all who may be charged with sexual harassment.

Marshall is entitled to discovery to determine the intent of the parties to the Agreement and the method of enforcing the rights protected by Article III. A. 1. Consequently, summary judgment was improvidently granted to UH on Marshall's claim for alleged breach of the Policy in Count I. However, summary judgment in favor of UH on Marshall's claims in Counts I and II for alleged breach of the Agreement was proper.

## IV.
## A.

In Count III, Marshall alleged that Defendants negligently inflicted emotional distress on him through the investigation and through the delay in reviewing his tenure application. Defendants

---

[16] In *NLRB v. Detroit Resilient Floor Decorators Local Union No. 2265, United Brotherhood of Carpenters & Joiners of America, AFL–CIO*, 317 F.2d 269, 270 (6th Cir. 1963), it was held that the language "wages, hours, and other terms and conditions of employment," in the National Labor Relations Act includes "all emoluments of value or other benefits accruing to employees out of their relationship with their employer."

argue that under HRS § 386–5 (1985)[17] Plaintiff's remedy is limited exclusively to a workers' compensation award. We agree with Defendants as to UH only.

The Hawai'i Supreme Court has consistently rejected challenges to the exclusivity of the Workers' Compensation Act. HRS § 386–5. *See Estate of Coates v. Pacific Eng'g*, 71 Haw. 358, 791 P.2d 1257 (1990) (citing *Kamali v. Hawai'ian Elec. Co.*, 54 Haw. 153, 504 P.2d 861 (1972)); *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 688 P.2d 1139 (1984); *Costa Minors v. Flintkote Co.*, 42 Haw. 518 (1958). Thus, if Marshall has a claim for negligent infliction of emotional distress against UH, his employer, he is restricted to asserting it as a workers' compensation claim.

The individual defendants, however, are in a different situation. Under HRS § 386–8 (1985),

> [w]hen a work injury for which compensation is payable under this chapter has been sustained under circumstances creating in some person *other than the employer or another employee of the employer acting in the course of his employment* a legal liability to pay damages on account thereof, the injured employee or his dependents (hereinafter referred to collectively as the employee) may claim compensation under this chapter and recover damages from such third person.

> \*　　\*　　\*

---

[17] HRS § 386–5 (1985) provides:

**Exclusiveness of right to compensation.** The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury.

> Another employee of the same employer shall not be relieved of his liability as a third party, if the personal injury is *caused by his willful and wanton misconduct.*

(Emphasis added.) The statute clearly allows an employee to sue a fellow employee for damages resulting from an injury caused by the fellow employee's willful and wanton misconduct.[18] *See Hirasa v. Burtner*, 68 Haw. 22, 702 P.2d 772 (1985).

In Count III, Marshall alleges that the individual defendants had acted within the scope of their employment. Without more, the allegation fails to state a cause of action. HRS § 386–5. However, in his affidavit opposing the Motion, Marshall alleges that the "investigation was maliciously conjured up to frustrate and defeat my tenure application." The averment of malice went beyond the allegation of the complaint. Nevertheless, that does not require the affidavit's rejection. Marshall should be allowed to amend his pleading to allege a proper cause of action for willful and wanton misconduct rather than have summary judgment entered against him. 10A C. WRIGHT, A. MILLER AND M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2738 (1983). Such a procedure would comport with the purpose of modern day pleadings and the policy of liberality toward their amendment. *Id.*

Under the issue raised by Marshall's affidavit, the doctrine of qualified immunity does not assist the individual defendants. Qualified immunity provides, as its name implies, only limited immunity to a public official for his tortious acts. *Towse v. State*, 64 Haw. 624, 647 P.2d 696 (1982). If in exercising his or her official authority the public official was motivated by malice, and not by an otherwise proper purpose, the cloak of immunity is lost, and

---

[18] BLACK'S LAW DICTIONARY 1434 (5th ed. 1979), defines "willful" as:

Premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification.

the official must defend the suit the same as any other defendant. *See Towse, supra.* The existence of malice is generally for the jury, *id.*; *Runnels v. Okamoto*, 56 Haw. 1, 525 P.2d 1125 (1974), and summary judgment is only proper on the issue when it has been removed from the case by uncontroverted affidavits or depositions. *Towse*; *Runnels*.

The record shows that the investigation of the alleged sexual harassment complaint did not follow the procedure prescribed by the Policy. The complaint concerned an event occurring more than six months earlier, yet no finding was made that there was good cause for the delay in making the complaint. Also, there is no showing that anyone asked the complainant to make a written statement. Even the timing of the complaint could cause a reasonable person to question whether any of the individual defendants might have encouraged or instigated it. Marshall was entitled to discovery to determine the reason for the departure from the Policy and whether the departure was maliciously motivated.

Marshall's affidavit, coupled with the individual defendants' departure from the Policy's procedures, is sufficient, in spite of the averments in the individual defendants' affidavits that they were motivated by a proper purpose, to raise a genuine issue of fact, and he should be allowed to amend Count III and to conduct discovery as to the individual defendants' motives for their actions.

## V.

Count IV is a claim for intentional infliction of emotional distress. Marshall alleged that Defendants acted intentionally and unreasonably in conducting the investigation and delaying his tenure application, and that their actions were likely to result in illness. We reach the same result on this count as we did on Count III.

First, although no Hawai'i appellate courts have passed on the issue, the Ninth Circuit Court of Appeals has held that an action for intentional infliction of emotional distress can be maintained only

38

under HRS Chapter 386. *See **Courtney v. Canyon Television & Appliance Rental, Inc.**,* 899 F.2d 845 (9th Cir. 1990). We now adopt the Ninth Circuit's holding. Thus, Marshall's claim against UH in Count IV is barred.

Second, the discussion of the issues of the individual defendants' motivation and qualified immunity applies to the allegations here.

Third, we perceive a discrete genuine issue of material fact as to whether or not the acts of the individual defendants were reasonable.

The elements of the tort of intentional infliction of emotional distress are: "(1) that the act allegedly causing harm was intentional; (2) that the act was unreasonable; and (3) that the actor should have recognized that the act was likely to result in illness." ***Wong v. Panis**,* 7 Haw. App. 414, 421, 772 P.2d 695, 696–97 (1989). The question of reasonableness is for the court in the first instance; however, if reasonable persons could differ on the question, it should be left to the jury. *Id.* The question of whether a defendant should have recognized that his act was likely to cause illness is a jury question. ***Chedester v. Stecker**,* 64 Haw. 464, 643 P.2d 532 (1982).

The individual defendants argue that they had the duty under the Policy to conduct the investigation and the authority under the Agreement to delay the tenure review until the investigation was completed; consequently their actions were not without just cause. However, since the Policy was not strictly followed, and the investigation was begun when Marshall's tenure review period was nearly over, reasonable persons could differ over the question of whether the individual defendants' actions were reasonable.

## VI.

In Count V, Marshall alleges that Defendants invaded his privacy by making unauthorized disclosure of information regarding the investigation and the delay of his tenure application.

Defendants argue that summary judgment was properly granted, since the individual defendants averred in their affidavits that they did not disclose confidential information to others, and Marshall's responsive affidavit contained only hearsay and conjecture.

Marshall argues that summary judgment was improper, because he had not had time for discovery. We agree with Marshall.

## VII.

In Count VI, Marshall alleges that the individual defendants intentionally interfered with his contractual relations with UH under the Agreement, causing him injury. In our view, Marshall has not been injured.

If Marshall's tenure application had been processed in strict accordance with the Agreement, the July 1, 1989 date was the earliest date on which he could have been awarded tenure. When he was awarded tenure, it was made retroactive to that date. Thus even assuming, *arguendo*, that the delay in the award of Marshall's tenure was a breach of the Agreement, he eventually got everything to which he was entitled.

## VIII.

Count VII is a complaint for damages under 42 U.S.C. § 1983 for violation of Marshall's civil rights. Marshall alleges that the individual defendants, acting in their individual capacities and under color of law, violated his substantive and procedural rights under the fourteenth amendment to the United States Constitution. Marshall's claim is utterly without merit, and summary judgment was properly granted.

The first inquiry in a claim under § 1983 "is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' of the United States." *Martinez v. California*, 444 U.S. 277, 284, 100 S. Ct. 553, 558, 62 L. Ed. 2d 481, 488, *reh'g denied*, 445

U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980). It is well settled that "a probationary university employee has no 'property' interest in obtaining tenure." *Beitzell v. Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981) (citations omitted). Since Marshall had no property interest in obtaining tenure, he has not been deprived of a cognizable fourteenth amendment right in this case, since the award was merely delayed.

Marshall also claims that the investigation and the alleged disclosures of confidential information damaged his reputation and "stigmatized" him. Again, Marshall has no claim for relief under § 1983. In *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405, *reh'g denied*, 425 U.S. 985, 96 S. Ct. 2194, 48 L. Ed. 2d 811 (1976), the Supreme Court held that reputation alone, apart from some tangible interest such as employment, does not implicate any "liberty" or "property" interest sufficient to invoke the protection of the due process clause. *See id.* at 701–02, 96 S. Ct. at 1165–66, 47 L. Ed. 2d at 414.

*Paul* also bars any claim Marshall may be deemed to have asserted in Count VII for any violation of his substantive due process right to privacy resulting from the alleged unauthorized release of confidential information, since his claim does not fit within any of the primary rights recognized by the Supreme Court as being protected under the Federal Constitution. *See id.* at 712–14, 96 S. Ct. at 1166, 47 L. Ed. 2d at 420–21.

## CONCLUSION

1. We vacate the summary judgment in favor of UH on Marshall's breach of the Policy claim in Count I, and on Count V.

2. We vacate the summary judgment in favor of Kopecky, Kormondy and Fullerton on Counts III, IV and V.

3. We affirm the summary judgment in favor of UH on Marshall's claim for breach of the Agreement in Counts I and II, and on Counts III and IV.

4. We affirm the summary judgment in favor of Defendants in Counts VI and VII.

This matter is remanded to the lower court for further proceedings.

*William J. Rosdil* (*Paul K. Hamano* with him on the briefs; William J. Rosdil, Attorney at Law, A Law Corporation, of counsel) for plaintiff–appellant.

*Norma Desantis Titcomb*, Deputy Attorney General (*Wesley F. Fong*, Deputy Attorney General, with her on the brief) for defendants–appellees.