**Jeffrey M. ELLISON, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., and Wendell A. Nelson, Defendants.**

**Civil No. 94–00891 ACK.**

United States District Court, D. Hawaii.

May 8, 1996.

**1504**

Jeffrey M. Ellison, Honolulu, HI, pro se.

Dana S. Ishibashi, Honolulu, HI, for plaintiff.

Clayton A. Kamida, Torkildson Katz Jossem Fonseca Jaffe Moore & Hetherington, Honolulu, HI, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KAY, Chief Judge.

#### BACKGROUND

On November 23, 1994, plaintiff Jeffrey M. Ellison, formerly an aircraft mechanic employed by defendant Northwest Airlines, Inc. ("Northwest"), filed a complaint against defendants Northwest and Wendell A. Nelson, his direct supervisor at Northwest (collectively, "Defendants"), alleging harassment, discrimination and wrongful termination.

On January 22, 1996, Defendants filed a motion for summary judgment. On April 18, 1996, Plaintiff filed an opposition. On May 6, 1996, the Court heard Defendants' motion.

All parties appeared through counsel. Upon considering the papers filed by the parties, the arguments at the hearing, and the record, the Court hereby GRANTS Defendants' motion for summary judgment.

#### FACTS

In 1981, plaintiff Ellison began working as an aircraft mechanic for defendant Northwest at its Minneapolis facility. In 1988, Plaintiff transferred to Northwest's Honolulu facility, where he worked on the flight line as an aircraft mechanic until July 17, 1992. On that day, according to the affidavit of Plaintiff's supervisor at that time Wendell Nelson, Nelson suspended Plaintiff and sent him home because of insubordinate conduct, use of abusive language towards Nelson and Plaintiff's crew chief Danny Marcom, and conduct that day which otherwise interfered with the performance of other employees.

Nelson scheduled an insubordination meeting with Plaintiff to take place July 20, 1992. Plaintiff however failed to appear for this meeting, allegedly because he was experiencing an emotional breakdown at the time and could not do so. Ellison Affid. at ¶ 11. Nelson then rescheduled the meeting for July 27, 1992 and sent Plaintiff a notice to this effect by certified mail.

On July 23, 1992, Plaintiff was taken to the emergency room at Queen's Medical Center and admitted for treatment in the psychiatric ward under the care of Dr. Mutsuoki Kai. Plaintiff stayed there for 8 days.

On July 27, 1992, Plaintiff failed to appear for the rescheduled meeting. Instead, union representative Danny Chong gave Nelson a letter dated July 24, 1992 from Dr. Harry Chingon, writing for Dr. Mutsuoki Kai, stating that Plaintiff was under the care of Dr. Kai and could not attend the meeting on July 27, 1992. *See* Plaintiff's Concise Stmt., Exh. 15 (letter dated July 24, 1992).

Also on July 27, 1992, Nelson sent Plaintiff (1) a notice entitled "Level 2 Reminder—Insubordination," reminding Plaintiff he already had an active level 1 reminder on file for insubordination and cautioning him to modify his behavior; and (2) a notice entitled "Medical Statement" informing Plaintiff that

"[i]n order to return to active employment with Northwest Airlines, your physician must sign a statement acknowledging you have fully recovered from your illness" and that "[u]ntil that time, . . . you will be compensated for medical leave." Plaintiff's Concise Stmt., Exhs. 16 (level 2 reminder) and 17 (notice re medical statement).

On August 7, 1992, Nelson received a letter dated July 30, 1992 from Dr. Kai, stating in relevant part as follows:

> [Plaintiff] has been at Queen's Medical Center under my care from July 24 to this morning. Diagnosis is 1. Adjustment Disorder with mixed emotional disturbances due to stresses at his job, 2. Chronic Dyspepsia, 3. Hypothyroidism.
>
> Yesterday he had an endoscopy by Gerald Hyatt, M.D., re: his so called stomach ulcer or a chronic dyspepsia.
>
> He will be followed by George Seberg, M.D. his internist.
>
> He will see a psychiatrist of his choice. He will return to his job on Monday, August 3rd. The above statement is almost exactly identical with my hand-written letter addressed to you that I handed to him this morning.
>
> Now I would like to add that he had some predischarge anxiety after he finished talking with me. As he was anxious about his return to the job on Monday, I suggested him to consult his future psychiatrist quickly about it.

Defendants' Concise Stmt., Exh. A.

Upon his release from Queen's Medical Center, Plaintiff sought the assistance of Dr. Alvin Murphy, who, on July 31, 1992, issued a note stating: "To Whom it May Concern . . . [Plaintiff] is seen for the first time today. He is clearly disabled and unable to work. The period of disability is unclear at present." Defendants' Concise Stmt., Exh. C. According to his affidavit, Nelson did not receive a copy of this note or know of Plaintiff's diagnosis as "disabled and unable to work" until August 25, 1992, at the first step grievance hearing on Plaintiff's termination on August 12, 1992. Nelson Affid. at ¶ 7. Plaintiff does not claim he communicated the contents of the note to Defendants prior to August 25, 1992.

By "Notice of Discharge" dated August 12, 1992, Nelson advised Plaintiff that he was terminated as of 8:00 a.m. that day. Defendants' Concise Stmt., Exh. B. The Notice states that the discharge was based on (1) the July 17, 1992 incident of insubordination; (2) Plaintiff's failure to appear for the July 27, 1992 rescheduled meeting and to contact Nelson since;[1] and (3) Plaintiff's failure to report for his scheduled work shift since August 3, 1992. See id. Nelson states in his affidavit that he "believed Ellison had no valid reason for not appearing for work, since Dr. Kai's letter [which was dated July 30, 1992 but allegedly not received by Nelson until August 7, 1992] stated that [Plaintiff] would be able to return to work on August 3, 1992." Nelson Affid. at ¶ 6.

Ellison's August 12, 1992 termination was grieved by his union, the International Association of Machinists and Aerospace Workers, under its collective bargaining agreement with Northwest. Plaintiff was represented during this grievance process by union representatives Nan Otto and Danny Marcom. See Defendants' Reply, Exh. A (Ellison Depo.) at 297–98. On or about March 30, 1993, Plaintiff wrote Timothy Mahoney, in house labor counsel for Northwest, stating that he "would like to meet with [Mahoney] to discuss [his] termination and disability, and to be placed back on active status under the Americans With Disabilities Act." Defendants' Concise Stmt. at ¶ 9.

On or about April 8, 1993, Mahoney replied to Plaintiff, stating that because Plaintiff's termination from Northwest was "not related to any disability," Northwest was under no obligation to reinstate his employment. Defendants' Concise Stmt. at 10.

On April 20–21, 1993 in Minneapolis, Minnesota, an arbitration hearing on Plain-

---

1. Although on August 7, 1992, Nelson did receive a letter from Dr. Kai regarding Plaintiff's medical treatment.

tiff's grievance was held before the System Board of Adjustment ("SBA").

On June 7, 1993, Plaintiff, proceeding *pro se*, filed a charge of discrimination against Northwest with the Hawaii Civil Rights Commission and the Honolulu office of the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"). Defendants' Concise Stmt., Exh. G. The charge does not name Wendell Nelson as a respondent. *Id.*

On October 3, 1993, the SBA rendered its Opinion and Award regarding Plaintiff's union grievance, finding that (1) the Level 2 Reminder dated July 27, 1992 was issued for just cause; but (2) Plaintiff's discharge was not for just cause. Plaintiff's Concise Stmt., Exh. 9 (opinion and award) at 23. The SBA ordered that Plaintiff be reinstated without backpay conditioned on a favorable fitness evaluation. Plaintiff's Concise Stmt., Exh. 9 (opinion and award) at 23. The SBA ordered that Plaintiff undergo a fitness for duty evaluation by a physician designated by Northwest. *Id.* Plaintiff could also designate his own physician to conduct an evaluation. If the physicians' evaluations disagreed, the parties were instructed to agree on a third physician, whose evaluation would be final and binding. *Id.* If Plaintiff finally was found unfit for service, he would be placed on unpaid medical leave for 90 days. If at the end of that period Plaintiff still had not been certified as fit for service, he would be terminated and such termination would be deemed for just cause. *Id.* at 24.

As a result of the SBA's decision, Nelson wrote Plaintiff on October 19, 1993 and informed him that evaluations with Dr. Charles Hipp and Dr. Hung had been scheduled for November 19, 1993. Plaintiff's Concise Stmt., Exh. 10. By letter dated December 9, 1993, Dr. Hipp wrote Timothy Caskey, manager of labor relations for Northwest, stating: "Both Dr. Hung and I feel that Mr. Ellison is not capable of working as an aircraft mechanic due to his underlying medical problem and functional limitations. It is unlikely he will be able to return to work as an aircraft mechanic in the foreseeable future." Plaintiff's Concise Stmt., Exh. 11. On De-

cember 16, 1993, therefore, Timothy Mahoney, labor counsel for Northwest, wrote Nan Otto, general chairwoman of Plaintiff's union, and informed her that Plaintiff would be placed on 90–day medical leave to expire March 15, 1994, at which time he would be terminated and such termination would be deemed for just cause. Plaintiff's Concise Stmt., Exh. 12. At the expiration of this period, by letter dated March 18, 1994, Nelson informed Plaintiff that pursuant to the SBA decision, Plaintiff was terminated effective March 15, 1994. Plaintiff's Concise Stmt., Exh. 13.

In addition to pursuing his union grievance, Plaintiff was also pursuing a workers' compensation claim, in which he was represented by attorney Lowell Chun–Hoon. Defendants' Reply, Exh. A (Ellison Depo.) at 16:9–11. On November 30, 1993, Plaintiff received a favorable workers' compensation award against Northwest from the Hawaii Department of Labor and Industrial Relations. Plaintiff's Concise Stmt., Exh. 7 (award).

At around this time, Plaintiff was also pursuing medical negligence claims against Queen's Medical Center and Dr. Mutsuoki Kai, in which he was represented by attorney Robert Merce, who had been recommended to Plaintiff by Lowell–Chun Hoon. *See* Defendants' Reply at 4; Ellison Depo. at 61:14–62:19. According to Defendants, Plaintiff's original claims were filed by Merce on Plaintiff's behalf on October 14, 1993. *See* Defendants' Reply at 4. The case then proceeded to a hearing on December 21, 1993 before the Medical Claims Conciliation Panel ("MCCP"), which resulted in a decision from the MCCP dated December 29, 1993 finding no negligence on the part of Queen's Medical Center but negligence on the part of Dr. Kai. Defendants' Reply, Exh. A, Ellison Depo., Exh. 2 (MCCP decision). After some settlement negotiations, Plaintiff, with some help from Merce by way of a memorandum with instructions dated July 21, 1994, filed suit against Queen's Medical Center and Dr. Kai. *See* Defendants' Reply at 4; Ellison Depo. at 289:1–23; Ellison Depo., Exh. 1 (July 21, 1994 memorandum from Merce).

According to his affidavit, Plaintiff began receiving workers' compensation benefits in November 1993, at which time he started renting a room at 505 Kao'opulu Way in Hawaii Kai. Ellison Affid. at ¶ 24. Sometime later that month, Plaintiff moved from that address and obtained a new post office box address at P.O. Box 25852, Honolulu, HI 96825. Ellison Affid. at ¶ 25; Defendants' Concise Stmt., Exh. J at Interrogatory No. 2. Plaintiff alleges that sometime in November 1993, he called the EEOC Honolulu office and gave it his new telephone number and post office box address. Ellison Affid. at ¶ 25; *see also* Defendants' Concise Stmt., Exh. H (EEOC log with 11/9/93 entry stating "CP [charging party] called to discuss NRTS [presumably notice of right to sue] & new phone no.").

By letter dated December 13, 1993, Plaintiff wrote to the EEOC and requested a right to sue letter, stating "I intend to file suit in Federal Court." Defendants' Concise Stmt., Exh. I. By letter dated December 14, 1993, the EEOC wrote Plaintiff, stating that it appeared its investigation was complete and that the investigation had uncovered no evidence Northwest knew Plaintiff had a disability or considered him as having a disability when it discharged him on August 12, 1992. The EEOC invited Plaintiff to submit within 10 days any further arguments or evidence he wished EEOC to consider before issuing its Letter of Determination. Plaintiff's Concise Stmt., Exh. 1. This December 14, 1993 letter was addressed to Plaintiff's new post office box address. *Id.*

By letter dated December 27, 1993, the EEOC issued its Determination, which found that "the evidence obtained during the investigation does not establish a violation of the [ADA]" and which informed Plaintiff he had to file suit within 90 days. Plaintiff's Concise Stmt., Exh. 2.

This December 27, 1993 Determination was mailed by EEOC not to Plaintiff's new post office box address, however, but to his former address at "505 Kao'opulu Way, Honolulu, HI 96825." Plaintiff's Concise Stmt., Exh. 2. The Determination was then forwarded by the post office on either January 3 or 4, 1994 to Plaintiff's correct post office box address. *See* Defendant's Concise Stmt., Exh. J at Exh. A (certified, postmarked and forwarded envelope produced by Plaintiff). In response to Defendants' request for admissions, Plaintiff admits he received the December 27, 1993 Determination but states: "I do not recall the exact date that I received such letter given my mental condition at that time." Defendants' Concise Stmt., Exh. J at Request for Admission No. 2.

According to Plaintiff, sometime in August 1994, he called the EEOC office to inquire about the status of his complaint and was informed that a right to sue letter had been sent several months earlier. Ellison Affid. at ¶¶ 27–28. Plaintiff then requested that another right to sue letter be issued. *Id.* at ¶ 29. The EEOC mailed this second right to sue letter on August 26, 1994. *See* Plaintiff's Memo. in Opp. at 4. Plaintiff filed the instant suit on November 23, 1994, eighty-nine days after August 26, 1994.

At the present time, Plaintiff is still being treated by Dr. Alvin Murphy and is still receiving workers' compensation benefits. Ellison Affid. at ¶ 33.

### SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may

not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv.*, 809 F.2d at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics*, 818 F.2d at 1468 (emphasis in original) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). Of

course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

Although not entirely clear, Plaintiff appears to make the following claims: (1) violation of the ADA, 42 U.S.C. §§ 12101 *et seq.*, based on (a) Defendants' August 12, 1992 termination of Plaintiff allegedly with knowledge of his disability and (b) Defendants' refusal to meet with Plaintiff in response to his March 30, 1993 letter requesting a meeting to discuss possible reinstatement and "reasonable accommodation;" (2) wrongful termination of employment while on medical leave for occupational injury; (3) negligent and intentional infliction of emotional distress as a result of his harassment at work; and (4) retaliatory discharge based on Plaintiff's refusal to violate Federal Aviation Administration ("FAA") regulations regarding airplane maintenance and clearance procedures. *See* Defendants' Concise Stmt., Exh. J at Request for Admission No. 1 and Interrogatory No. 1; *see also id.*, Exh. G (Plaintiff's EEOC charge); Mahoney Affid. at ¶¶ 2–3 (rejecting Plaintiff's March 30, 1993 request for meeting); Plaintiff's Opp. at 12–13 (violation of ADA based thereon).

## I. *ADA*

Defendants argue that Plaintiff's ADA claim is barred because he failed to file suit within the applicable 90 day period and because he is not entitled to equitable tolling. The Court agrees.

### A. *90 Day Filing Requirement*

The ADA incorporates the complaint filing procedures set forth in Title VII of the Civil Rights Act of 1964, as amended. 42 U.S.C. § 12117(a). Title VII provides that an action must be filed within 90 days of the "giving of ... notice" of the EEOC's dismissal of a claimant's charge. 42 U.S.C. § 2000e–5(f)(1). This 90 day filing requirement constitutes a statute of limitations. *Scholar v. Pacific Bell*, 963 F.2d 264, 267 (9th Cir.1992); *Ed-*

*wards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1445 (9th Cir.1990).

Here, the EEOC's Determination and right to sue letter dated December 27, 1993 was mailed on December 28, 1993 by certified mail to Plaintiff at his old address at "505 Kao'opulu Way." Defendant's Concise Stmt., Exh. J at Exh. A (certified, postmarked and forwarded envelope containing December 27, 1993 Determination, produced by Plaintiff). The Determination was then forwarded on either January 3 or 4, 1994, to Plaintiff's new post office box address at "P.O. Box 25852, Honolulu, HI 96825–0852." *Id.*

Plaintiff admits receiving the forwarded Determination but claims he cannot recall when. *See* Defendants' Concise Stmt., Exh. J at Request for Admission No. 2. Plaintiff's complaint was filed November 23, 1994, over 10 months after the Determination was forwarded to Plaintiff's post office box address. The question presented is whether it should be presumed that Plaintiff received the Determination a certain number of days after forwarding.

In similar situations where the date of receipt of a right to sue letter has been uncertain, courts have applied a presumption of receipt within a certain number of days after mailing, including 3, 5 or 7 days. *See, e.g., Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 1724 n. 1, 80 L.Ed.2d 196 (1984) (presumed date of receipt of right to sue letter was 3 days after issuance, based on Fed.R.Civ.P. 6(e)); *Pacheco v. Int'l Business Machines Corp.,* 1991 WL 87538, *3–4 (N.D.N.Y.1991) (same); *Rich v. Bob Downes Chrysler Plymouth, Inc.,* 831 F.Supp. 733, 735 (E.D.Mo.1993) (same); *Stambaugh v. Kansas Dept. of Corrections,* 844 F.Supp. 1431, 1433 (D.Kan. 1994) (same, 3 day receipt presumption triggered by right to sue letter being mailed and by the fact that date of actual receipt "is either unknown or in dispute"); *Hunter v. Stephenson Roofing, Inc.,* 790 F.2d 472, 475 (6th Cir.1986) (applying 5 day presumption where claimant failed to notify EEOC of change of address, citing 20 C.F.R. § 422.210(c) (1985) (presumption that social security claimant receives notice of right to

sue 5 days after notice first enters mail)); *Banks v. Rockwell Int'l North American Aircraft Operations,* 666 F.Supp. 1053, 1059 (S.D.Ohio 1987) (same, citing *Hunter*), *aff'd,* 855 F.2d 324 (6th Cir.1988); *Witt v. Roadway Express,* 880 F.Supp. 1455, 1461 (D.Kan. 1995) (applying 5 day presumption); *Roush v. Kartridge Pak Co.,* 838 F.Supp. 1328, 1335 (S.D.Iowa 1993) (applying 7 day presumption, suggested by defendants, as reasonable period of time); *McNeill v. Atchison, Topeka & Santa Fe Ry. Co.,* 878 F.Supp. 986, 990 (S.D.Tex.1995) (applying 7 day presumption as reasonable, citing *Roush*).

The Court first finds that here, where the December 17, 1993 Determination was forwarded to Plaintiff's correct address and where Plaintiff admits having received the Determination, a presumption of receipt within some reasonable time properly applies. The Court need not decide however whether 3, 5 or 7 days is the appropriate period of time, although it finds that the appropriate period should be no greater than 7 days. Even applying a 7 day presumption to a forwarding date of January 4, 1994 yields at the latest a presumptive receipt date of January 11, 1994, which is much more than 90 days prior to the filing of Plaintiff's complaint on November 23, 1994. For purposes of this motion, therefore, the Court will apply a presumptive receipt date of January 11, 1994.

The Court further finds that the January 11, 1994 presumptive receipt date is unrebutted, whether by any evidence of nonreceipt (in fact, Plaintiff admits he received the Determination) or by any evidence of receipt on any other day within 90 days of initiation of the present action. *See Roush v. Kartridge Pak Co.,* 838 F.Supp. 1328, 1335 (S.D.Iowa 1993) (granting summary judgment despite lack of any evidence as to whether plaintiff received EEOC right to sue letter on the basis she "has failed to ... generate a material question of fact as to whether she received the [letter]" and defendant is entitled to rely on presumption of receipt); *Rich v. Bob Downes Chrysler Plymouth, Inc.,* 831 F.Supp. 733, 735 (E.D.Mo.1993) ("Particularly when considering the presumption that Rich received the

notice three days after its mailing, Rich has not shown that a genuine issue exists as to whether he received the notice within ninety days of initiating this action."); *Witt v. Roadway Express,* 880 F.Supp. 1455, 1461 (D.Kan. 1995) (invoking 5 day presumption of receipt where "[p]laintiff has not presented any evidence to rebut the presumption or to establish the actual receipt date"); *see also Stambaugh v. Kansas Dept. of Corrections,* 844 F.Supp. 1431, 1433 (D.Kan.1994) ("plaintiff is in the best position to know and prove whether the right-to-sue letter was actually received"); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (plaintiff must produce at least some "significant probative evidence tending to support the complaint").

The Court accordingly finds that Plaintiff's complaint was filed outside the applicable 90 day period and therefore is barred as untimely—unless equitable tolling applies.

## B. *Equitable Tolling*

■ The Ninth Circuit has held that the 90 day filing requirement is subject to equitable tolling, although the doctrine is available only in "extreme cases" and is to be applied "sparingly." *Scholar v. Pacific Bell,* 963 F.2d 264, 267 (9th Cir.1992); *see also Irwin v. Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–458, 112. L.Ed.2d 435 (1990) ("Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.") (footnotes omitted) (quoted in part in *Scholar* ).

Plaintiff argues that equitable tolling ought to apply here on account of his "severe mental condition." Plaintiff's Opp. at 4. The Court does not concur. Preliminarily, the Court notes that Plaintiff does not present one of the situations set forth in *Irwin:* he neither filed a timely though defective pleading during the 90 day period nor was he tricked by Northwest into allowing the deadline to pass.

In addition, even assuming mental incapacity can toll the 90 day period, *see, e.g., Scott v. United States,* 847 F.Supp. 1499 (D.Haw. 1993), *aff'd,* 70 F.3d 120 (9th Cir.1995), the Court finds there is no genuine issue of equitable tolling by reason of mental incapacity here. First, it is clear, as Defendants point out in their reply, that during the period from August 12, 1992, the date of Plaintiff's complained of termination, to January 11, 1994, the presumptive receipt date of the EEOC's Determination and right to sue letter, Plaintiff was not mentally incapacitated with respect to being able to manage his legal affairs.

Second, according to the affidavit of Plaintiff's doctor, Dr. Alvin Murphy, Plaintiff's condition in fact generally *improved* after January 11, 1994. Moreover, although Dr. Murphy states repeatedly that Plaintiff is disabled and cannot work, at no time does he state that Plaintiff was mentally incapacitated to the point of being unable to deal with his legal affairs. Accordingly, at least during the 90 day period following January 11, 1994, the Court finds there is no genuine issue of equitable tolling by reason of mental incapacity.

### 1. *August 12, 1992 through January 11, 1994*

During the period from August 12, 1992 through January 11, 1994, Plaintiff clearly was not mentally incapacitated to the point of being unable to deal with his legal affairs. During this period, Plaintiff pursued his union grievance against Northwest with the help of union representatives Nan Otto and Danny Marcom. *See* Ellison Depo. at 297–98. Plaintiff also pursued his workers' compensation claims with the help of attorney Lowell Chun–Hoon. Defendants' Reply, Exh. A (Ellison Depo.) at 16:9–11. Plaintiff also pursued his medical negligence claims against Queen's Medical Center and Dr. Mutsuoki Kai with the help of attorney Robert Merce. *See* Defendants' Reply at 4; Ellison Depo. at 61:14–62:19. After attend-

ing a hearing on December 21, 1993 before the Medical Claims Conciliation Panel, Plaintiff subsequently filed suit against Queen's and Dr. Kai. Defendants' Reply, Exh. A, Ellison Depo., Exh. 2 (MCCP decision); Defendants' Reply at 4; Ellison Depo. at 289:1–23; Ellison Depo., Exh. 1 (July 21, 1994 memorandum from Merce). Finally, Plaintiff, proceeding *pro se*, filed a charge of discrimination on June 7, 1993 against Northwest with the Hawaii Civil Rights Commission and the EEOC and pursued this claim before the EEOC. Defendants' Concise Stmt., Exh. G.

There are more examples demonstrating that Plaintiff was not mentally incapacitated during this period. On or about March 30, 1993, Plaintiff wrote Defendants' in house counsel Timothy Mahoney and requested a meeting to discuss his termination, disability and possible reinstatement. Defendants' Concise Stmt. at ¶ 9. On April 20–21, 1993, Plaintiff attended an arbitration hearing on his union grievance in Minneapolis, Minnesota before the SBA. In November 1993, Plaintiff claims he called the EEOC office in Honolulu and notified it of his new telephone number and post office box address. Ellison Affid. at ¶ 25; *see also* Defendants' Concise Stmt., Exh. H (EEOC log with 11/9/93 entry stating "CP [charging party] called to discuss NRTS [presumably notice of right to sue] & new phone no."). Finally, in December 1993, Plaintiff claims he called the EEOC regarding the status of his complaint and the issuance of a right to sue letter. Defendants' Concise Stmt., Exh. I; Ellison Affid. at ¶¶ 27–28.

### 2. *After January 11, 1994*

In order to evaluate Plaintiff's mental condition subsequent to January 11, 1994, the Court considers the affidavit of Plaintiff's doctor, Dr. Alvin Murphy, which affidavit describes the progression of Plaintiff's condition in part as follows:

2. ... [S]ince July 31, 1992, ... [Plaintiff] was *clearly disabled and unable to work.*

3. Plaintiff had been hospitalized (7/24/92 to 7/31/92) and diagnosed as suffering from *severe depression* with accompanying *anxiety due to work stresses.*

4. During early 1993, Plaintiff was *dysphoric, agitated, chronically cried, and had sleep problems.*

5. On January 29, 1993, Plaintiff was again hospitalized with *suicidal ideation[,] reduced sociability, increased irritability, and difficulties with maintaining his usual daily activities.*

.    .    .    .    .

7. During late March 1993, Plaintiff *attempted suicide* by taking an overdose of Pamelor.

8. On June 1, 1993, Plaintiff was re-admitted to The Queen's Medical Center because of *persistent severe depression; [h]e was retarded, discouraged, and suicidal.*

.    .    .    .    .

10. On June 19, 1993, Plaintiff again was re-admitted to [Queen's] with *suicidal ideation.*

11. In July 1993, Plaintiff's diagnosis was *Major Depression,* Recurrent DSM 296.33....

13. On August 13, 1993, Plaintiff's diagnosis was still *Major Depression,* Recurrent DSM 296.33.... He suffered *sleep problems, dysphoria, anhedonia, appetite and weight changes, difficulties in energy, motivation, concentration....*

14. On November 5, 1993, I reported to Plaintiff's worker's compensation insurance carrier that *although the patient does seem improved,* he is far from being in condition to return to his job....

15. Later on November 30, 1993, Plaintiff reportedly was upset for having to go on welfare; he was still polyarthralgia (neuralgic pain in more than one joint) noting he walked like a 60 year old; and *though feeling better was fatigued.*

16. During 1994, I was still treating Plaintiff, who was *still disabled and unable to work.*

17. Though *doing relatively better in January 1994,* Plaintiff was still dysfunctional and being medicated with Ritalin,

Parnate, Tamazepam (Restoril), Ambien, Diazepam, and Trazedone (Desyrel).

. . . . .

19. In March of 1994, Plaintiff was still depressed about his condition, i.e., *his inability to work, his depression was up and down but generally better.* . . .

20. During April 1994, Plaintiff was still "up and down"; on April 15, was noted as chronic emergency; on April 19[,] *appeared to be moderately depressed, but not tearful;* the following week, however, April 22 and 26, Plaintiff *seemed to improve, but by the 29th appeared more paranoid.*

. . . . .

22. In June 1994, Plaintiff still *up and down* and was still having difficulty functioning in the most rudimentary ways and going through mood swings; [i]n addition to his other medications, Plaintiff was prescribed Valium.

23. In July 1994, Plaintiff reported wondering why he was so reluctant to go out or be around people. At this time, Plaintiff appeared confused as to what his goals were, he related he would either do himself in or find a new career; he was still dysfunctional in the most rudimentary ways.

24. During this period, Defendants' Expert George D. Bussey, M.D., evaluated Plaintiff and submitted to me his "differential diagnosis . . . as follows:

> Axis I—*Major depression,* recurrent vs. dysthymic disorder. . . .
>
> Axis II—(Primary diagnosis) Mixed personality disorder with histrionic, dependent, narcissistic, paranoid, and antisocial traits. . . .
>
> Axis IV—*Moderate to severe acute and chronic stressors.* Mr. Ellison is unemployed, isolated from any social support networks, and living on the couch in someone else's home.
>
> Axis V—Current and highest global assessment of functioning in the past year (as presented by Mr. Ellison), 40–50."

25. In August 1994, Plaintiff was *more depressed than recently, suicidal, and appeared to take a turn for the worse.*

26. By late August 1994, his friend and roommate related that Plaintiff no longer lay in bed all day, which was *definitely an improvement* and that *he was able to concentrate when he wishes,* but still forgets things, leaves doors unlocked, and still had difficulty prioritizing, tearful, difficulty making lists and getting things done, and setting goals.

27. By September [1994], Plaintiff was still *"up and down"* between *"apparently suicidal"* tendencies and stability.

28. It was difficult at this time to tell whether his behavior was due to long term dysfunctional habits or from the effects of depression or from the effects of medication.

Plaintiff's Concise Stmt., Murphy Affid. at 1– 5 (emphasis added).

Dr. Murphy's affidavit indicates that despite the fact that Plaintiff was "clearly disabled and unable to work," "retarded, discouraged, and suicidal," and was suffering from, *inter alia,* "persistent severe depression," "suicidal ideation," and "difficulties in energy, motivation [and] concentration," he nevertheless was able, during the period from August 12, 1994 through January 11, 1994, to manage all of his legal affairs as described in the preceding section.

Dr. Murphy's affidavit also indicates that at least during the 90 day period following January 11, 1994, Plaintiff's condition "seemed to improve" and was "generally better." In any event, there is no evidence Plaintiff's condition was worse after January 11, 1994. There is also no evidence Plaintiff ever was mentally incapacitated to the point of being unable to deal with his legal affairs. Even in August 1994, after he "was more depressed than recently, suicidal, and appeared to take a turn for the worse," Plaintiff nevertheless still was able to request another right to sue letter from the EEOC.

The Court accordingly finds that at least during the 90 day period following January 11, 1994, there is no genuine triable issue of equitable tolling by reason of mental incapacity. Plaintiff's ADA claim therefore must be dismissed on this basis alone. Alternatively, the Court makes the same finding for the

entire period from January 1994 through August 1994. In any event, Plaintiff's ADA claim is dismissed as untimely. *See, e.g., Biester v. Midwest Health Serv., Inc.,* 77 F.3d 1264, 1268 (10th Cir.1996) (declining to toll 90 day period for mental incapacity due to "major depression" where no "exceptional circumstances" alleged—plaintiff was not "adjudged incompetent or institutionalized" and "the evidence demonstrates that, in spite of his mental condition, [plaintiff] 'was capable of pursuing his own claim,'" inasmuch as he "wrote to the EEOC ... to request a right to sue notice"); *Miller v. Runyon,* 77 F.3d 189, 191 (7th Cir.1996) ("[M]ental illness tolls a statute of limitations only if the illness *in fact* prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them.... Most mental illnesses today are treatable by drugs that restore the patient to at least a reasonable approximation of normal mentation and behavior.") (emphasis in original).

Finally, and again alternatively, the Court dismisses Plaintiff's ADA claim because there is no evidence Defendants terminated him because of his mental illness. Nelson states in his affidavit that he did not receive or become aware of Dr. Murphy's note dated July 31, 1992—stating "To Whom it May Concern ... [Plaintiff] is seen for the first time today. He is clearly disabled and unable to work. The period of disability is unclear at present."—until August 25, 1992, after he already had terminated Plaintiff on August 12, 1992. Defendants' Concise Stmt., Exh. C; Nelson Affid. at ¶ 7. Plaintiff presents no evidence to oppose this. Moreover, although Dr. Kai's letter dated July 30, 1992 (which Nelson received on August 7, 1992) states that Plaintiff "will see a psychiatrist of his choice," the letter also states that "[Plaintiff] *will return to his job on Monday, August 3rd.*" Defendants' Concise Stmt., Exh. A (emphasis added).

Accordingly, even assuming Defendants had notice as a result of Dr. Kai's July 30, 1992 letter that Plaintiff was suffering from a mental illness, there is no evidence Defendants knew that Plaintiff was *disabled* as a result of that mental illness. In fact, Defendants were *told* by Plaintiff's doctor that Plaintiff *would* be coming back to work that coming Monday (July 30, 1992 was a Thursday). Consistent with this, Nelson states in his affidavit that he fired Plaintiff because Plaintiff "was absent without leave on August 3–7, 1992 and August 10–12, 1992," based on "Dr. Kai's letter stat[ing] that [Plaintiff] would be able to return to work on August 3, 1992." Nelson Affid. at ¶ 6.

The Court accordingly finds there is no genuine issue that Defendants did not fire Plaintiff because of his mental illness. *See, e.g., Miller v. Runyon,* 77 F.3d 189, 192 (7th Cir.1996) ("[T]he Postal Service did not fire Miller because of his [mental] illness. It fired him because *even though his psychiatrist had pronounced him able to return to work, he did not return.* Miller's superiors had no reason to believe that he was prevented from returning by his mental illness.") (emphasis added).[2]

---

2. Defendants also argue in their reply at page 14 that because "Plaintiff admits he is receiving total disability benefits from Workers' Compensation [and] has applied for long term disability benefits and Social Security disability benefits," he is estopped from claiming he is a *"qualified individual with a disability"* entitled to protection under the ADA—since "qualified" means the individual "can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 555 (D.Kan.1995) (plaintiff who represented in connection with applications for long term disability insurance benefits and Social Security disability benefits that she was totally disabled was estopped from claiming she was a "qualified individual with a disability" under ADA); *McNeill v. Atchison, Topeka & Santa Fe Ry. Co.,* 878 F.Supp. 986, 990 (S.D.Tex.1995) (ADA claim brought 8 days after verdict in prior trial of FELA claim, in which trial plaintiff testified he was permanently disabled, "is either blatantly fraudulent or utterly ridiculous"); *Reigel v. Kaiser Found. Health Plan of North Carolina,* 859 F.Supp. 963, 969–70 (E.D.N.C.1994) (court stated that plaintiff who certified she was totally disabled in order to receive long term disability insurance benefits "cannot speak out of both sides of her mouth with equal vigor and credibility before this court" but also held there was no genuine issue for purposes of summary judgment); *Harden v. Delta Air Lines, Inc.,* 900 F.Supp. 493, 496–97 (S.D.Ga.1995) (not allowing plaintiff to "speak out of both sides of [his] mouth ... without offering any evidence whatsoever that his condition has changed," citing *Reigel*); *Cheatwood v. Roanoke Indus.,* 891 F.Supp. 1528, 1538 (N.D.Ala.1995) (plaintiff's testimony

## II. WRONGFUL TERMINATION

■ The nature of Plaintiff's claim of "wrongful termination while on medical leave due to occupational injury" is somewhat obscure. In their moving papers, Defendants noted that Plaintiff seemed to be alleging a public policy wrongful discharge claim based on *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982) and H.R.S. § 378–32(2), which prohibits an employer from discharging an employee "[s]olely because the employee has suffered a work injury which arose out of and in the course of the employee's employment." *See* Defendants' Mot. at 7–8. Defendants argued that if so, Plaintiff's claim is barred because H.R.S. Ch. 378 itself provides a sufficient remedy for its violation. *Id.; see also* Haw.Rev.Stat. § 378–33 (aggrieved employee may file a complaint with the Department of Labor and Industrial Relations); *Ross v. Stouffer Hotel Co. (Hawaii) Ltd., Inc.*, 76 Hawai'i 454, 464, 879 P.2d 1037 (1994) (*Parnar* claim is barred "where the policy sought to be vindicated is already embodied in a statute [in *Ross* as here, HRS Ch. 378] providing its own remedy for its violation. The fact that the relief available under *Ross's* HRS § 378–2 claim is limited to equitable relief ... does not change our conclusion."). The Court agrees.[3]

## III. INFLICTION OF EMOTIONAL DISTRESS

■ In his opposition, Plaintiff states he "is not alleging a public policy tort claim such as that found in [*Parnar*]." Plaintiff's Opp. at 10.[4] Instead, Plaintiff claims he suffered "severe emotional and mental distress" as a result of Defendants' harassment, citing H.R.S. § 386–5. *Id.* Section 386–5 states in relevant part:

> The rights and remedies herein granted to an employee ... on account of a *work injury* suffered by the employee shall exclude all other liability of the employer to the employee, ... at common law or otherwise, on account of the injury, *except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.*

*Id.* (emphasis added) (second emphasized phrase added by 1992 amendments effective June 19, 1992).

First, the Court finds that all of Plaintiff's emotional distress claims constitute a "work injury" arising from the conditions of his employment. *See* Plaintiff's Opp., Exh. 7 (decision of Department of Labor and Industrial Relations awarding Plaintiff workers' compensation for stress and depression caused by harassment at work); Ellison Affid. at 1–7 (listing incidents of harassment at work); *see also Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 851 (9th Cir.1990) (HRS § 386–5, bars emotional distress claims "as long as there is a 'causal connection between the injury and any incidents or conditions of employment ... regardless of where or when the injury' took place") (quoting *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 648–49, 636 P.2d 721 (1981)).

However, no claim of work related infliction of emotional distress is viable outside the exclusivity bar of H.R.S. § 386–5 unless

---

at workers' compensation trial that he was unable to perform the essential functions of any job at defendant's plant estopped him from claiming he was "qualified" individual under ADA, citing *Garcia–Paz*); *Cline v. Western Horseman, Inc.*, 922 F.Supp. 442, 447–449 (D.Colo.1996) (granting summary judgment based on estoppel and on the evidence in the record); *but cf. Morton v. GTE North Inc.*, 922 F.Supp. 1169, (N.D.Tex. 1996) (expressing opinion that "[t]he *Garcia–Paz* strict estoppel approach finds no support in the case law" and that instead representations of disability are only evidence to be considered in determining whether there exists a genuine issue of standing).

Plaintiff does not dispute Defendants' assertions regarding his representations of total disability. The Court accordingly finds in the alternative that Plaintiff lacks standing to pursue an ADA claim, both under a strict estoppel theory and because there is no genuine issue that Plaintiff is not a "qualified" individual under the statute.

3. The Court also finds in the alternative that there is no genuine issue that Defendants terminated Plaintiff not because of any occupational injury but because Plaintiff failed to appear for work even though his doctor stated he would. *See, supra*, Section I.B.2.

4. Any such claims accordingly are dismissed.

it is "related to" sexual harassment or sexual assault. Here, Plaintiff alleges no sexual harassment or sexual assault.

Accordingly, H.R.S. § 386–5 bars all of Plaintiff's negligent or intentional infliction of emotional distress claims against Northwest and against Nelson for conduct within the scope of his employment. *See, supra, Courtney,* 899 F.2d at 851 (holding prior to 1992 amendments that HRS § 386–5 bars emotional distress claims "as long as there is a 'causal connection between the injury and any incidents or conditions of employment ... regardless of where or when the injury' took place"); *O'Connor v. Hilton Hawaiian Village,* 763 F.Supp. 1544, 1549 (D.Haw.1990) (same); *Marshall v. Univ. of Hawaii,* 9 Haw. App. 21, 38, 821 P.2d 937 (1991) (adopting Ninth Circuit's holding in *Courtney); see also Wangler v. Hawaiian Elec. Co., Inc.,* 742 F.Supp. 1465, 1468 (D.Haw.1990) ("[A]lthough the exclusivity provision of Hawaii's workers compensation law extends immunity to co-employees acting within the scope of their employment, it does not relieve co-employees of liability to the extent that a fellow employee's personal injury is caused by their 'wilful and wanton misconduct.' ") (citing HRS § 386–8 and *Morishige v. Spencecliff Corp.,* 720 F.Supp. 829, 837 (D.Haw. 1989)).

■ With respect to Nelson individually, however, H.R.S. § 386–8 provides that "[a]nother employee of the same employer shall not be relieved of his liability as a third party, if the personal injury is caused by his wilful and wanton misconduct." Hawaii courts have held that this provision preserves a plaintiff's right of action in common law or under another statute against a fellow employee individually and "clearly allows an employee to sue a fellow employee for damages resulting from an injury caused by the fellow employee's willful and wanton misconduct.[5]" *Marshall v. Univ. of Hawaii,* 9 Haw. App. 21, 36, 821 P.2d 937 (1991) (footnote in original); *see also Hun v. Ctr. Properties,* 63 Haw. 273, 277, 626 P.2d 182 (1981) ("HRS

§ 386–8 does not establish an independent or new cause of action ... [but] preserv[es] the plaintiff's right of action in common law or under a statute."); *Wangler v. Hawaiian Elec. Co., Inc.,* 742 F.Supp. 1465, 1468 (D.Haw.1990) (exclusivity provision of HRS § 386–5 "does not relieve co-employees of liability to the extent that a fellow employee's personal injury is caused by their 'wilful and wanton misconduct' ").

Here, although H.R.S. § 386–8 may allow a claim against Nelson individually for intentional infliction of emotional distress, it does not allow one for simply *negligent* infliction of emotional distress. *See Marshall v. Univ. of Hawaii,* 9 Haw.App. 21, 36, 821 P.2d 937 (1991) (conduct must be "wilful and wanton").

In addition, any claim of *intentional* infliction of emotional distress (and for that matter any claim of negligent infliction of emotional distress) is subject to the two year statute of limitations in H.R.S. § 657–7, which states:

> Actions for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after, except as provided in section 657–13 [disability by reason of infancy, insanity or imprisonment].

*See Linville v. State of Hawaii,* 874 F.Supp. 1095, 1104 (D.Haw.1994) (two year period in HRS § 657–7 "applies to ... personal injury claims of negligent and intentional infliction of emotional distress").

Plaintiff was sent home on July 17, 1992 and never returned to work. He did not file the instant suit until November 23, 1994. Moreover, in light of the discussion in Section I above, the Court finds there is no genuine issue of disability by reason of insanity or mental incapacity in general, and there certainly is none by reason of infancy or imprisonment. Accordingly, any claims against Nelson individually for negligent or

---

5. *Black's Law Dictionary* 1434 (5th ed. 1979), defines "willful" as:

Premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with

indifference to the natural consequences; unlawful; without legal justification.

intentional infliction of emotional distress are dismissed.[6]

## IV. RETALIATORY DISCHARGE

Plaintiff's final claim is one for "[r]etaliatory discharge based on [his] refusal to violate [FAA] rules regarding airplane maintenance and clearance procedures." Defendants' Concise Stmt., Exh. J at Interrogatory No. 1. Despite Plaintiff's earlier denial, this appears to be a public policy wrongful discharge claim based on *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982), and the Court will construe it as such.

Defendants argue that Plaintiff's claim of retaliatory discharge is barred by the two year statute of limitations in H.R.S. § 657–7. *See Linville v. State of Hawaii*, 874 F.Supp. 1095, 1104 (D.Haw.1994) (Title IX wrongful discharge discrimination claim subject to two year statute of limitations under HRS § 657–7); *cf. Pele Defense Fund v. Paty*, 73 Haw. 578, 597, 837 P.2d 1247 (1992) (HRS § 657–7 is the "general" personal injury statute of limitations and applies to all "actions for the recover of compensation for damage or injury to persons," including 42 U.S.C. § 1983 claims).

Plaintiff does not dispute the applicability of the two year limitations period but contends it should be equitably tolled for mental incapacity. As discussed in Section I.B above, here the Court finds no genuine issue of equitable tolling on the basis of mental incapacity. Accordingly, Plaintiff's claim of retaliatory discharge is dismissed as untimely.[7]

---

**6.** Alternatively, the Court finds that the allegations in Plaintiff's affidavit concerning his alleged "harassment" at work raise no genuine issue of "outrageous" conduct necessary to support a claim for intentional infliction of emotional distress. *See Wong v. Panis*, 7 Haw.App. 414, 421, 772 P.2d 695 (1989) (quoting *Restatement (Second) of Torts* § 46, cmt. d (1965)).

**7.** Defendants also argue that Plaintiff's *Parnar*-based claim of retaliatory discharge is preempted by the Airline Deregulation Act of 1978, codified and amended July 5, 1994, 49 U.S.C. § 41713(b)(1) (formerly 49 App.U.S.C. § 1305(a)(1)), which preempts any state law "related to a price, route, or service of an air carrier." *See Marlow v. AMR Serv., Corp.*, 870

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment. There are no remaining claims.

IT IS SO ORDERED.

---

F.Supp. 295, 299 (D.Haw.1994) (jetbridge maintenance company supervisor's claim he was terminated for raising safety concerns preempted by Act); *Aloha Islandair, Inc. v. Tseu*, 1995 WL 549319, *2 (D.Haw.1995) (disability discrimination and retaliation claims of monocular pilot applicant barred by Act); *but see Ruggiero v. AMR Corp.*, 1995 WL 549010, *9 (N.D.Cal.1995) (declining to follow *Marlow* and relying instead on *Anderson v. American Airlines, Inc.*, 2 F.3d 590, 597 (5th Cir.1993) (Act did not preempt a claim for money damages of retaliatory discharge for filing a workers' compensation claim) in finding no preemption). In light of its ruling, the Court need not decide this issue.